IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 27, 2009 Session

**STATE OF TENNESSEE v. JOEY LEE GOINS**

**Appeal from the Criminal Court for Sullivan County**
**No. S49,095     Robert H. Montgomery, Judge**

_____

**No. E2009-00021-CCA-R3-CD - Filed May 17, 2010**

_____

A Sullivan County jury convicted the defendant, Joey Lee Goins, of facilitation of second degree murder and especially aggravated robbery. The defendant appeals, claiming that the trial court erred in excluding statements of certain witnesses. The defendant also appeals the court's failure to sequester the jury in light of the media coverage of the trial. Lastly, the defendant argues that the court erred in imposing the defendant's sentences consecutively to each other and to his unrelated federal sentence of life without parole. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Johnathan A. Minga (on appeal and at trial), Johnson City, Tennessee; and Mark Slagle (at trial), Johnson City, Tennessee, for the appellant, Joey Lee Goins.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Amber Massengill and Kaylin Hortenstine, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Introduction*

This case stems from the murder and robbery of Terry Lynn Rhymer, the victim, on June 18, 2002. On April 28, 2004, the defendant was charged by presentment with one count of the first degree premeditated murder of the victim, *see* T.C.A. § 39-13-202(1)

(1997), one count of first degree felony murder, *see id.* § 39-13-202(2), and one count of especially aggravated robbery, *see id.* § 39-13-403. After a four-day jury trial, the jury acquitted the defendant of the first degree premeditated murder charge. The jury convicted the defendant of the lesser-included offense of facilitation of second degree murder in count two. The jury found the defendant guilty as charged of especially aggravated robbery. The trial court sentenced the defendant to 12 years' incarceration for the conviction of facilitation of second degree murder to be served consecutively to the 25 years' incarceration it imposed for the especially aggravated robbery conviction. The trial court ordered the effective 37-year sentence to be served consecutively to the defendant's sentence of life without parole imposed in an unrelated federal case. The defendant filed a timely motion for new trial and notice of appeal.

### *Pre-Trial Hearings*

The trial court conducted extensive pre-trial hearings on two issues that the defendant ultimately presents on appeal. First, the State moved to exclude from evidence statements given by Anita Quillen Holt regarding the possible guilt of third parties in the murder of the victim. Second, the defendant requested that the trial court sequester the jury.

### *Motions Regarding Ms. Holt*

The defense strategy involved submitting evidence to the jury of third parties' possible responsibility for the murder. This evidence included three statements given by Ms. Holt, who implicated three individuals: Larry Quillen, Jackie Nash, and Teddy Vinson. She gave two statements to the Bristol Police Department on June 24, 2002, and an additional statement on September 23, 2002. Ms. Holt died before trial for reasons unrelated to the case. The State moved in limine to prohibit the defendant from "presenting evidence and/or making reference to the statements of Anita Holt." The State subsequently moved that the defense also refrain from "referencing and/or questioning any witness concerning the victim holding Anita Holt at gunpoint." The State then amended its first motion to exclude Ms. Holt's statements from evidence. The amended motion argued that Ms. Holt's statements should not be admitted under Tennessee Rule of Evidence 804(b)(3)'s hearsay exception for statements against interest by an unavailable declarant. Although the trial court denied the State's motion in limine to exclude any mention of the victim's holding Ms. Holt at gunpoint, the court reserved its ruling on allowing Ms. Holt's statements into evidence.

In the first statement, made at 2:40 p.m. on June 24, 2002, Ms. Holt said she knew the victim through her former boyfriend, Mark Crebs. The statement alleged that in 2000, the victim held her at gunpoint and forced her to watch as his associates severely beat Mr. Crebs. She said that she and Mr. Crebs eventually made amends with the victim and that

they began smoking marijuana together. Ms. Holt's first statement reflected, however, that six months before the victim's death, the victim accused her and her then-current boyfriend, Teddy Vinson, of stealing his marijuana. The statement said that Ms. Holt's brother, Larry Quillen, lived with her and Mr. Vinson at 961 Hill Street in Bristol at the time of the victim's murder. Notably, the first statement maintained that Ms. Holt had no knowledge of who killed the victim.

In a second statement given at 9:40 p.m. on June 24, 2002, Ms. Holt stated, "I was not entirely truthful during the first statement because I am afraid of my brother Larry Quillen." The second statement said that on June 18, 2002, Ms. Holt, Mr. Vinson, Mr. Quillen, and Mr. Nash were drinking at the 961 Hill Street residence when Mr. Quillen began talking about the victim's holding Ms. Holt at gunpoint. Mr. Quillen stated, "I'm going to show that mother f***er. He don't hold my sister at gun point." Ms. Holt also recalled that Mr. Quillen said, "Let's kill him. I'll get everything he's got." Mr. Quillen then took a sword from the wall and left the house with Mr. Vinson and Mr. Nash. The statement said that the three men were gone for 20 minutes, and the men then talked on the front porch for approximately 30 minutes.

In her second statement, Ms. Holt said that when the men returned she heard Mr. Quillen say, "I killed the mother f***er. He got what he deserved." She said that Mr. Quillen stated that he "cut [the victim] and beat him" and that she heard Mr. Vinson throw "something heavy into his tool box" that "sounded like a crow bar." She heard the men discuss finding "a couple thousand" in the victim's pocket, and she remembered seeing blood spatter on the men's shirts. This statement said that Mr. Nash left the next morning and that Mr. Vinson told Mr. Quillen to leave.

Ms. Holt's last statement, given on September 23, 2002, stated that on June 19, 2002, when the police were investigating the victim's home, Mr. Vinson "was acting very 'funny.'" The statement also asserted that Mr. Vinson said, "They're coming to get me."

During the pretrial motion hearings, the defense argued that Ms. Holt's statements should be admitted as evidence pursuant to Tennessee Rule of Evidence 804(b)(3). The defendant argued that, because Ms. Holt was an unavailable witness, *see* Tenn. R. Evid. 804(a)(4), admission of her statements should be permitted because they ran afoul of her penal interests, *see id.* 804(b)(3). The defendant pointed to Ms. Holt's second statement, where she admitted being untruthful with the police officers, and argued that this admission would subject Ms. Holt to prosecution for "false statement to a police officer." The State replied that "[the defense attorneys] don't want the statement in saying 'I lied about my first statement.' They want the statements in regarding the murder. Those statements were not against her interest."

The defense further argued that the statements of Ms. Holt should be permitted into evidence aside from the hearsay rules as part of the defendant's constitutionally guaranteed right to present a complete defense. *See generally Holmes v. South Carolina*, 547 U.S. 319 (2006). The defendant argued that Ms. Holt's statements were "substantive evidence of this defendant's [c]onstitutional right to present a defense on his behalf showing third party guilt." The State responded that "[y]ou can't just trump the Rules of Evidence and put in any evidence that helps the defendant in a case."

The trial court determined that, although Ms. Holt's lying to police officers may have subjected Ms. Holt to criminal liability, the court did not believe that such liability rose to the level as to make the statement reliable. The trial court also found no constitutional violation in prohibiting the evidence because other witnesses would testify about similar matters throughout the trial.

During the trial, the defendant made a final attempt to admit the statements of Ms. Holt by declaring that they were not hearsay because he intended to admit them for their effect on the listener and not for the truth of the matter asserted. The trial court determined that, even if Ms. Holt's statements were not considered hearsay, they were not admissible under Rule of Evidence 403 because the statements would mislead the jury and have little probative value.

*Motions Regarding Eric Hilliard*[1]

The defendant also attempted to produce evidence inculpating Mr. Vinson, Mr. Quillen, and Mr. Nash through the testimony of Eric Hilliard. The State opposed this evidence as inadmissible hearsay. During an offer of proof, Mr. Hilliard testified that on the day after the victim's murder, he heard Mr. Vinson say that "it couldn't happen to a better mother f***er and he was glad the mother f***er got what he deserved." He also testified that he heard Mr. Vinson tell Mr. Vinson's brother that "it wasn't supposed to happen like that" and that "it was just supposed to have been a fight." The defense argued that Mr. Vinson's statements were contrary to his penal interests because they amounted to his confessing to the murder. The trial court found that Mr. Vinson's purported statements were not clear in implicating him in the murder. The court ruled that these statements were inadmissible hearsay, and in light of the court's ruling, the defense elected not to call Mr. Hilliard.

---

[1]We note that the defense attempted to introduce Mr. Hilliard's testimony during trial and did not address this issue pretrial; however, because the defendant makes similar arguments for both Ms. Holt's statements and Mr. Hilliard's testimony, we explain both in the pretrial section of the opinion.

-4-

*Sequestration of the Jury*

The defense moved to sequester the jury in expectation of media coverage of the lengthy trial. Defense counsel argued that the defendant's involvement in unrelated trials for murder and bank robbery resulted in significant press coverage. The trial court noted, however, that it would be "surprised that you'll have many jurors that will know anything or read anything or heard anything about this case" because the murder occurred six years prior to trial. The trial court further credited jurors' ability to comply with the court's instructions to refrain from exposing themselves to news coverage of the case. The trial court denied the defendant's motion for sequestration.

The trial court conducted individual voir dire in order to ensure that potential jurors had no prejudicial knowledge of the defendant's previous offenses. During the course of the trial, the trial court questioned the jurors every morning as to whether they had been exposed to coverage of the trial the previous night.

*Trial*

Victor Sanabria testified that he knew the victim because both men frequented the American Legion. Mr. Sanabria worked as a part-time real estate agent in 2002, and he agreed to list the victim's home. He stated that he visited the home on June 18, 2002, to estimate the cost of fixing the victim's roof in preparation for selling the home. During this time, Mr. Sanabria noticed that the victim possessed a large "wad" of money, and he commented to the victim that he should not "be flashing money like that." Mr. Sanabria attempted to contact the victim later that night after leaving his home. He went to the American Legion at 7:30 or 8:00 p.m. expecting to see the victim, but the victim was not present. After having a beer, he left the American Legion to visit the victim's home. He discovered that the back door of the victim's home, which was the only door used to gain entry, was locked and that he did not hear any noise coming from the residence. He did not contact authorities because he knew the victim was recovering from surgery and that he had a habit of passing out while intoxicated.

Mr. Sanabria attempted to contact the victim several times on June 19, 2002. He again tried to locate the victim at the American Legion and at his home. When the victim failed to answer his door, Mr. Sanabria looked through a window on an unused side-access door and saw a body lying on the floor. He contacted 9-1-1, and the police arrived and gained entry to the residence. Mr. Sanabria followed the officer into the home and found the victim lying face-down with a knife in his back.

Mr. Sanabria recalled that the victim lived "like a poor man" and that most of

his income came from disability payments. He knew that the victim sold marijuana, and he recalled him "flashing" a large amount of cash on another occasion in the summer of 2001. He also recalled being at the victim's house and seeing his marijuana supply and telling the victim to conceal the drugs when conducting sales in his home.

On cross-examination, Mr. Sanabria admitted that he knew little about the victim's drug-selling business. Regarding June 19, 2002, he recalled that a neighbor across the street named Larry helped him attempt to gain entry to the victim's home after he observed the body.

Detective Aaron Blevins of the Bristol Police Department testified that he was a patrol officer on June 19, 2002, and that he was dispatched to the victim's home at 961 Hill Street at 8:00 p.m. When he arrived, he met two gentlemen standing outside the victim's home. He used his pocket knife to open a window and one of the men crawled through the window and opened the back door from the inside of the house. Upon entering the home, he saw a large amount of blood on the floor and the victim lying on the floor with a large knife handle sticking from his back. At that point, he ushered the two men away from the home and secured the crime scene.

Sergeant Jason McCready of the Bristol Police Department also reported to the crime scene. He located a key ring on the left side of an arm chair in the den area of the home by the body, which he took into evidence. Sergeant McCready also collected from the residence some photographs, a small photo album, a small address book, and a prescription medication bottle containing a green leafy substance that appeared to be marijuana. He also found a green tray on which a plastic bag sat with more leafy substance that appeared to be marijuana. The tray held a small pick, a small set of scales, and two smoking pipes that Sergeant McCready associated with marijuana use.

Sergeant McCready noted that the Bristol Police Department also investigated Mr. Nash, Mr. Vinson, and Mr. Quillen and that he was present for portions of Mr. Nash's and Mr. Quillen's interviews. He believed that, at the time, these interviews provided probable cause that these three men were involved in the murder of the victim, and he charged the men with first degree murder. Sergeant McCready collected a sword from Mr. Vinson's home in June 2002 as well as a hammer and a tire tool. He explained that the charges against Mr. Quillen, Mr. Nash, and Mr. Vinson were dismissed in General Sessions Court in June or July of 2002. He further explained that he considered restarting the prosecution of the men but that on July 30, 2002, Justin Jones came forward with information inculpating the defendant in the murder of the victim.

On July 31, 2002, he visited 408 Walnut Hill Road where the defendant

resided. Antoinette "Toni" Thomas owned the residence and resided there with her daughter, Elizabeth "Beth" Thomas.[2] The defendant dated Toni, and Justin Jones, who dated Beth, also resided at the home. Sergeant McCready collected the metal head of a hammer, which was found in a wooded area behind the home. He had received information that the hammer had been burned so that only the head of the hammer remained.

Sergeant McCready introduced several items of clothing belonging to Mr. Nash, Mr. Quillen, and Mr. Vinson. He explained that these items were collected during his investigation of these individuals and that he was led to believe that the clothing would contain evidence of the victim's homicide.

On cross-examination Sergeant McCready admitted that probable cause supported his filing an affidavit of complaint against Mr. Quillen, Mr. Nash, and Mr. Vinson; however, he maintained that most evidence against these men was based on hearsay. He also acknowledged that he had considered attempting a second prosecution of these individuals until Mr. Jones implicated the defendant in the murder.

Sergeant McCready then read the statement of Mr. Quillen, who told officers that on the night of the victim's murder, he saw Mr. Vinson get a knife from his room and that he concealed the knife beside his right leg and went across the street to the victim's house. Mr. Quillen's statement said that he walked away after Mr. Vinson walked to the victim's house because he did not want to witness what Mr. Vinson was going to do.

Sergeant McCready then read the statement of Mr. Vinson. Mr. Vinson's statement reflected that he knew the victim through his girlfriend, Ms. Holt. Mr. Vinson stated, "She had been friends with [the victim] when she was with Mark Crebs until [the victim] held her at gunpoint while another guy beat Mark Crebs." The statement said that Ms. Holt and the victim eventually began talking again and that she bought marijuana from the victim. Mr. Vinson continued, "I always called [the victim] before I went to the house and he was always waiting on me. . . . [He] would get me some marijuana and weigh it out. If he had to give change he would pull out a wad of cash." Mr. Vinson estimated the defendant carried between $2,000 and $3,000 cash. Mr. Vinson also noted that the victim told him that he bought five to six pounds of marijuana at a time.

Mr. Vinson said in his statement that, on the week of the victim's murder, he worked for Bob Mitchell on a house in Bristol, Virginia. Mr. Vinson did not drive, so Mr.

_____

[2]Although this court customarily refers to people by their surname, this case involves constant references to Toni Thomas , Beth Thomas, and Brian Thomas. For the purposes of clarity, we will refer to these witnesses by their first names.

Mitchell picked him up. Ms. Holt also helped him with work on the house. Mr. Vinson told officers that he worked every day from 9:00 a.m. until 6:30 or 7:00 p.m. and that after arriving back home he would drink beer. During the evenings, several people may have visited his house including Mr. Nash and Mr. Quillen. Mr. Vinson maintained that the police informed him and the guests at his home of the victim's death and that he had no involvement in the murder.

Sergeant McCready then read two statements by Mr. Nash. In the first statement, Mr. Nash declared that he had no involvement in the murder of the victim and that he had never been in the victim's home. Mr. Nash said that he arrived at his cousin's house on Hill Street at approximately 6:30 p.m. and that he saw an estimated six-foot-tall male talking on a mobile telephone by the victim's residence.

In a second statement, Mr. Nash said that he knew of the victim through his uncle, Larry Norton, who lived across the street from the victim. Mr. Nash maintained that he "did not know that [the victim] was a dope dealer until recently." His statement reflected that Mr. Nash became acquainted with Mr. Vinson while the two were incarcerated and that on June 18, 2002, Mr. Vinson picked him up from his home. Mr. Nash said that the two men bought some whiskey and drank to intoxication in Mr. Vinson's back yard. He and Mr. Vinson then went to the victim's home across the street, and Mr. Vinson started arguing with the victim. Mr. Nash, in his statement, recalled punches being thrown between the two and that "[t]he next thing [he] saw was [the victim] lying on the floor on his back" near the coffee table. He said that Mr. Vinson stood over the victim with a knife and that Mr. Nash knew that the victim was dead. Mr. Nash said that he left the house upon seeing the knife and that he later saw Mr. Vinson carrying what "could have been a fire safe." The statement ended, "I didn't do nothing and I got out of there. I was wrong by not saying something earlier."

Lieutenant Debbie McCauley testified that, although she originally investigated Mr. Quillen's, Mr. Nash's, and Mr. Vinson's involvement in the victim's death, she received a call on July 30, 2002, to speak with Mr. Jones involving the case. She testified that Mr. Jones was shaking, scared, "teary-eyed," and very nervous. She said that her discussion with Mr. Jones led to the discovery of physical evidence of the murder of the victim. This evidence included a guitar case, guitar, and amplifier located on Sugar Hollow Road. Mr. Jones also assisted her in finding a portable fire safe. Lieutenant McCauley then obtained the keys that Sergeant McCready found at the victim's home and successfully used them to unlock the fire safe.

Beth Thomas testified that she lived at 408 Walnut Hill Road with her mother and that she dated Mr. Jones in 2002. She explained that they had dated since 2000 and that Mr. Jones went into the Army in April 2001. She stated that the two wrote letters and spoke

on the telephone during this time. Beth said that Mr. Jones came back to Bristol in February 2002 and lived with Justin Starnes for a few weeks. She stated that the defendant arrived a couple of weeks later and lived with him and that the two shared an apartment at East Tennessee State University ("ETSU"). She said that the two then moved into her residence at 408 Walnut Hill Road in late March or early April 2002 and that Toni Thomas, her mother, Brian Thomas, her brother, and Joe Balcom, her cousin, also lived at the residence.

Beth testified that the defendant began dating Toni and stayed in Toni's bedroom. Mr. Jones slept outside in a tent and was not allowed to come in the home past a certain time because Toni forbid him from being in Beth's bedroom late at night. She said that originally Mr. Jones slept on a couch in the living room but that, because he violated Toni's rules by going to Beth's room after hours, he was exiled to the tent. She stated that the sleeping arrangements caused Mr. Jones to resent the defendant. Beth stated that she often argued with the defendant; however, she defined their relationship as "pretty good." She said that Mr. Jones and the defendant "were really good friends" but that the defendant's personality dominated Mr. Jones. She testified that the defendant would "boss" people around in the household.

Beth stated that Mr. Jones had a shorter temper after returning from the Army. She recalled an incident where he punched a hole in her bedroom door after the defendant had arranged a prank where he and others bombarded Mr. Jones with water balloons. She described this behavior as "uncharacteristic" of Mr. Jones.

Beth testified that on July 30, 2002, Mr. Jones visited her at marching band camp. She testified that he seemed worried, nervous, and excited. Based on her conversation with him, she decided they should contact the police. Mr. Jones then spoke with a police officer for 30 minutes and informed Beth that he was going to the police station. After marching band camp ended, Beth also went to the police station.

Beth stated that she saw the defendant with a duffle bag containing "a big block of marijuana" some time at the end of June or beginning of July 2002. She described the marijuana as a compressed "brick." She did not ask the defendant where he obtained the marijuana.

Beth recalled that the defendant never had a significant amount of money and that, aside from his brief employment at Bryant Labels with Toni's stepfather, he was unemployed. She stated that the defendant and Mr. Jones had no operating vehicle and often drove her green Subaru Legacy or her mother's black Grand Am.

On cross-examination, Beth acknowledged that she had known Mr. Jones three

years longer than the defendant. She also testified that Mr. Jones was dissatisfied with the Army and wanted to return home to be with her. She said that, on one occasion after he returned, Mr. Jones pushed her against the wall during a fight. She was aware that Mr. Jones possessed a handgun before the defendant arrived in Bristol. She said that she had broken up with Mr. Jones at one point and that he responded by putting his gun to his head and threatening to kill himself.

Brian Thomas testified that he lived at 408 Walnut Hill with his mother, Toni, and his sister, Beth. Brian also testified that the defendant had a personality that dominated Mr. Jones. He stated that the two men would have physical altercations in the back yard and that the defendant always prevailed in the fight. He also testified that the defendant was more muscular than Mr. Jones.

Brian testified that he did not know the victim but that his cousin, Mr. Balcom, intended to introduce them. He testified that one night they went to the victim's home to look at a guitar that he had for sale but that the victim was not home. Brian said that this was the only occasion on which he visited the victim's home.

He could not recall the defendant's having much money, but he remembered that toward the end of the summer of 2002 the defendant began purchasing groceries and that he bought a massage gift certificate for Beth and Toni. The only employment Brian recalled the defendant's having was working at Bryant Labels for approximately $6.00 an hour.

Brian testified that in the summer of 2002 the defendant showed him "like half a pound or a pound" of marijuana rolled up in a towel or shirt and that the defendant asked him to help sell it. The defendant told him that he had gotten a "good deal" on the drugs. He specifically recalled this occurring after the victim's murder.

On cross-examination, Brian admitted that the relationship between the defendant and Mr. Jones became strained over time. He recalled that Mr. Jones kept a gun in his glove compartment. He also stated that Mr. Jones had a quick temper. Brian also confirmed Mr. Jones's becoming upset with the defendant over the sleeping arrangements in the home and his breaking Beth's door after being hit by water balloons. He admitted smoking marijuana with both the defendant and Mr. Jones.

On redirect-examination, Brian testified that the defendant took the gun from Mr. Jones and that he showed it to him and said it was for his protection.

Joe Balcom, Toni's nephew, testified that he lived with Toni while he attended college in 2000 and 2002. He also testified that the defendant dominated the relationship

with Mr. Jones and that the defendant was larger than Mr. Jones.

Mr. Balcom testified that he knew the victim through the American Legion, where he went once or twice a month. He purchased marijuana from the victim for personal use and resale. Mr. Balcom went to the victim's home to conduct drug transactions, and the victim kept his marijuana underneath his seat in the living room. Mr. Balcom testified that he generally bought a pound of marijuana, which the victim provided in a five-gallon Ziploc bag. He testified that the victim always had enough money to provide change if needed. He said that, after conducting a transaction, the victim would either place the money in his pocket or in a fireproof lock box. Mr. Balcom testified that he paid $600 for a pound of marijuana but that he generally made $400 after resale.

Mr. Balcom also testified that he observed a guitar and amplifier at the victim's home that the victim was trying to sell.

He stated that he introduced the defendant to the victim at the American Legion. Mr. Balcom had discussed purchasing marijuana from the victim with the defendant in May 2002. He stated that, approximately two weeks after the meeting at the American Legion, the defendant and he went to the victim's home to view the guitar and amplifier. The defendant handled the guitar. Mr. Balcom also made a marijuana transaction in the presence of the defendant, and the defendant witnessed the victim placing $600 in the lock box, which already held an indiscernible amount of money.

Mr. Balcom testified that in mid-July 2002, he spoke with the defendant, who told him that he had a pound of marijuana. The defendant told him that he had gotten a good deal on the marijuana.

On cross-examination, Mr. Balcom admitted that he never saw the defendant with the pound of marijuana. He also stated that, to his knowledge, Mr. Jones did not smoke or sell marijuana. Mr. Balcom admitted seeing a gun that may have belonged to Mr. Jones. He also admitted that his knowledge of the relationship between Mr. Jones and the defendant was somewhat limited because he only lived at the home during the weekends.

Justin Jones testified that he dated Beth for two or three years, beginning in 2000 during his senior year of high school. He joined the Army in April 2001 in hopes of becoming a Ranger. After being injured in training, he was sent to Fort Benning in Georgia and became unhappy with his time in the Army. Mr. Jones said, "One night I just made a rash decision to throw all my belongings into my vehicle and head north." He explained that he was disheartened with the Army and that he missed Beth and his family. Mr. Jones testified that he and his mother devised a plan for him to enter the Veterans Administration

-11-

("VA") hospital in Johnson City to avoid legal charges for going absent without leave. He testified that he misrepresented to personnel at the VA hospital that he had suicidal thoughts.

Mr. Jones stated that he was transferred to the psychiatric wing of Fort Benning's military hospital and that he first met the defendant there. He testified that he and the defendant were roommates and became friends. The two knew each other two or three weeks until Mr. Jones was discharged from the Army. Mr. Jones stated that he received an honorable medical discharge in early February 2002. He stated that his temperament changed after being in the Army and that he became more easily angered.

Upon returning to Bristol, Mr. Jones discovered that his parents would not allow him to live with them because of his deserting the Army. He moved into his friend Justin Starnes's parents' home in Blountville. He testified that he worked at Tri-Cities Aviation as a refueller during this time. He received a telephone call from the defendant, who said he had nowhere to go after being discharged from the Army. Mr. Jones extended an invitation to join him in the Tri-Cities and arranged for a bus ride to Bristol.

Mr. Jones testified that he and the defendant briefly stayed with the Starnes' and then moved into a dormitory room at ETSU. He explained that during this time the defendant went with him to visit Beth and that Toni and the defendant began a romantic relationship. After approximately a month, the two moved into the Walnut Hill residence with Toni in mid-April 2002. He explained that the defendant slept in Toni's bedroom and that he initially slept on the couch. Mr. Jones said that, because he violated Toni's rule that he could not be in Beth's room past 11:00 p.m., he had to stay outside the home.

Mr. Jones drove a Toyota 4Runner; however, the car broke down during the time he stayed at the Thomas residence, and he mostly used Beth's Subaru. He testified that neither he nor the defendant worked during most of their time at the Thomas residence and that neither of them paid rent.

Mr. Jones stated that his relationship with the defendant became "more and more stressful," and he fought with the defendant in the Thomas' back yard. He testified that the defendant, who was stronger than he, defeated him in the fight.

Mr. Jones testified that one day he was dropping Toni off at work when he was struck by another vehicle. He discussed the incident with the defendant, and he agreed to have the defendant break his finger "to hopefully later on get some sort of insurance money out of the accident." They met with a local attorney about the incident on June 18, 2002, the same day the victim was killed.

Mr. Jones testified that one evening the defendant returned home from the American Legion with Mr. Balcom and that the defendant pulled him aside and stated that he had met the victim. Mr. Jones recalled that the defendant told him that the victim had a large amount of marijuana and cash in his home and would be a profitable person to rob.

He testified that he and the defendant went to the victim's home in early June. He said that the defendant told the victim that he wished to view a guitar he had for sale, although the defendant used this as an excuse to "case" the home. After the visit, he and the defendant drove past the victim's home on other occasions when he was not home.

Mr. Jones explained, "The plan pretty much consisted of, you know let's get a hold of an attorney . . . and schedule an appointment for the insurance deal, and that we can use that for an alibi for the robbery." After meeting with the attorney about his automobile accident on June 18, 2002, he and the defendant drove past the victim's house to assure he was home. The men drove in Toni's black Grand Am. The two then stopped at a McDonald's restaurant to change clothes. Mr. Jones maintained that he was unarmed and that the defendant carried a small sledgehammer and a gun. He stated that the .22 caliber pistol once belonged to him but that the defendant had taken the gun from him.

Mr. Jones admitted that, upon seeing the hammer and gun, he concluded that the defendant would likely kill the victim but that he did nothing to stop him. He said that the men knocked on the victim's back door and that the victim let them into the home. He said that, as he and the defendant walked through the home, they were cautious to not leave fingerprints. He stated that he saw the victim and the defendant round a corner and walk into a den and that he watched the defendant swing the hammer at the victim. Mr. Jones heard a thump and heard the victim say, "Oh God." When Mr. Jones entered the den, he saw the defendant leaned over the victim and hitting him repeatedly with the hammer. He testified that the men put on gloves after the defendant finished striking the victim. The defendant then told him that they needed to spread out and look through the house. Mr. Jones found a wooden box with several quarters inside, and he poured the quarters into his pocket.

Mr. Jones testified that the defendant looked through the home, then returned to the living room with a Bowie knife and that he said something "to the effect of . . . let's make sure the guy is dead and started sawing his neck." The defendant then searched the victim's pockets. Mr. Jones testified that the defendant started making fun of him because he had not participated in the killing of the victim. Mr. Jones then took the Bowie knife and stuck it in the victim's back.

He testified that the defendant removed a safe that contained a "brick and a half" of marijuana along with another bag with "crumbs." The defendant also took a set of

-13-

keys, cash, and the guitar and amplifier. He testified that the men returned to their vehicle and returned to the Thomas household. He said that they started a bonfire in the back yard where they burned the hammer and that, the following day, they threw the remaining head of the hammer into the wood line behind the property. Mr. Jones eventually led police officers to the location of the hammer head. He testified that he and the defendant attempted to sell the guitar and amplifier but that, after failing to find a buyer, they tossed the items into some brush on a back road by Boone Lake. The men also threw the lock box in this area, and they threw the keys into a ditch.

Mr. Jones testified that on July 30, 2002, the defendant drove him to band camp to meet with Beth. He testified that he had a discussion with the defendant during the car ride and that, upon arriving at camp he spoke with his friend Colby Smothers about the conversation. He said that Mr. Smothers told him to talk with the police, and Mr. Jones called 9-1-1. He gave two statements to the police at the Bristol Police Station. He admitted that his first statement only implicated the defendant; however, he maintained that his second statement, which comported with his testimony, was truthful.

Mr. Jones testified that, while in custody in Sullivan County, the defendant also was in custody in the same facility. He said that the defendant arranged to have two letters and one drawing delivered to him. The letter read, "I keep asking myself why you would do this to me. I've helped you alot [sic] Justin." The letter stated that the defendant was a "father in a way" to Mr. Jones and that he "fought" to allow Mr. Jones to stay at the Thomas residence. The letter said, "I don't know of what all you have done. But I need for you to tell them that I didn't do this. I know you're sick but you don't take me with you, Justin. You know me." It continued, "Your [sic] probably going to be killed by the state. I will help Toni's family and your mom. But tell them I am innocent." The defendant wrote, "Be a man God Damnit and take responsibility for yourself. It's over for you."

Mr. Jones testified that he was confused when he first received this letter but that he concluded that the letter was a story concocted by the defendant to place the blame on Mr. Jones. Mr. Jones also testified that he read the letter as a threat toward him.

Mr. Jones also received a drawing made by the defendant that showed Mr. Jones being held down in order to be anally raped by four men. Below the picture was written, "Is Crime and Lies worth it? The truth will set me free you S.O.B." He testified that the picture upset him.

Mr. Jones received a second letter which read,

Justin,

I understand why your [sic] doing this to me. I'm sorry for pushing you around. I also should have been there more for you. Maybe you wouldn't have done these things. Everyone will find the truth. I just wish you would tell it. I feel so sorry for Beth now. You have hurt her and her family for such a long time. If you have any love for her don't leed [sic] her into your world of lies and horror. Your [sic] truly <u>beyond</u> help. Everyone in her family has never liked you. Brian and Joe are turning more against you than ever. Brian and Stephanie are going to tell Beth about you cheating on her. Don't you remember[?] Stephanie's sister. She is going back to school and Toni and her family are trying to show her what your [sic] truly about. Thank God you can't hurt anyone else. Also I wanted you to know that theres [sic] proof against you. I can't wait to show it. . . .

Also theres [sic] over twenty people who have come forward to testify against you. Think hard Justin of what is going to happen to you. Think hard of your past and the things you have done. Trying to kill your father, pulling a gun on Joe. Talking to all sorts of people who say you were planning to hurt people.

Goodby looser [sic],
and don't rest in peace.

P.S. Start doing pushups, because your arms are so little.

Mr. Jones testified that this letter caused him to feel very threatened. He also recalled that the defendant would yell across the jail during the time they served together, "Hey Justin, I know you're over there."

Mr. Jones admitted pleading guilty in federal court to conspiracy to commit the offense of car jacking and bank robbery. In the instant case, he pleaded guilty to second degree murder and especially aggravated robbery. Mr. Jones also acknowledged that his plea agreement required that he testify in the instant case.

On cross-examination, Mr. Jones admitted that he fantasized about robbing convenience stores, banks, and restaurants when he was in high school. He explained, "They were just theoretical, wouldn't it be cool cat burglary, James Bond type stuff . . ." He

maintained that he did not intend to actually commit any of these crimes. Mr. Jones also admitted that he told people on occasion that he wanted to kill the defendant.

Mr. Jones agreed that he went absent without leave from the Army in January 2002 despite his oath to loyally serve in the Army. He again admitted that he lied to VA personnel about his homicidal hallucinations and suicidal tendencies. Mr. Jones admitted that he viewed a medical discharge as his way out of the Army. Mr. Jones also acknowledged the incident where he broke Beth's door and another incident where he broke his windshield in anger.

He explained that his relationship with the defendant became continually strained until July 30, 2002, when he decided to contact the police. He estimated that he spoke with the police from 11 p.m. until the morning of July 31, 2002. He admitted that he initially told police that he only helped the defendant dispose of the guitar and amplifier and the lock box. He said that eventually he told the police the truth in a subsequent statement on July 29, 2003. He admitted that he did not admit to the extent of his involvement with the murder of the victim until after his federal plea agreement in an unrelated case.

Mr. Jones admitted that he formed a "very rudimentary" plan to escape the Greene County Detention Center which was discovered by federal marshals. He testified that he never attempted to complete the plan and that he was later transferred to a different jail.

Mr. Jones stated that he did not know Mr. Vinson, Mr. Quillen, or Mr. Nash.

Richard Snyder, who served jail time with the defendant, testified that he recalled a conversation regarding the defendant's killing another person with a hammer. Mr. Snyder admitted he had been convicted of federal crimes, but he maintained that the State did not promise any leniency in exchange for his testimony.

Dr. Gretal Stephens testified that she performed the autopsy on the victim. She testified that the victim suffered multiple blows to his head from a blunt object which caused multiple lacerations of the scalp and disfigured and fractured the skull. She estimated that the victim had been struck at least 16 times. Dr. Stephens testified that she observed three series of multiple cuts to the victim's neck. She said that the incisions would have required a sharp blade because they were "reasonably deep." The victim also had two injuries to his right hand: a cut to his thumb and a blunt injury to his second and third fingers. Dr. Stephens testified that the head, neck, and hand injuries occurred while the victim was still breathing and his heart was still beating.

Dr. Stephens also noted a large knife protruding from the victim's back and an

-16-

additional stab wound. She estimated that these injuries occurred after the victim had died because they did not indicate any bleeding.

Dr. Stephens examined several possible weapons to discern what could have been used in causing the victim's death. Dr. Stephens explained that when law enforcement officers brought the various weapons for her examination, they did not indicate from whom those weapons were taken. She reviewed the hammer head found behind the Thomas home and determined it was capable of causing the injuries to the victim. She also reviewed a smaller hammer and a tire tool recovered from Mr. Vinson's home. She testified that the smaller hammer could have caused some of the wounds but that it could not have caused all of them. She testified that the tire tool could conceivably match some of the victim's injuries but that "the little round tip on it is a little bit too round and small for the larger scallops."

Dr. Stephens testified that the sword found at Mr. Vinson's home was sharp enough to cause the cuts to the victim's neck; however, she maintained that the handle was loose and that it would have been difficult to wield with the victim being on the ground. She also examined a set of smaller knives belonging to Mr. Nash and determined that they could have been used to cut the victim's throat; however, she testified that one serrated buck knife would not have been consistent with the victim's injuries. Dr. Stephens examined the Bowie knife found in the victim's back and determined that it was too dull to cause the incisions to the neck. Dr. Stephens noted, however, that the knife could have become dull by remaining in the victim's back for a long period of time, and she noted that the knife had started to rust inside the body.

Dr. Stephens concluded that the cause of death of the victim was lethal brain injury due to being struck multiple times in the head with a blunt object and suffering multiple incised wounds to the neck.

Captain Charles Thomas of the Bristol Police Department's Criminal Investigation Division testified that he obtained a search warrant for the Thomas residence on July 24, 2002. He obtained a letter addressed to the defendant at 408 Walnut Hill in one of the bedrooms. He also located a firearm and bag of marijuana seeds on a night stand in the same bedroom. Captain Thomas learned that the bedroom was the one Toni shared with the defendant.

Special Agent Michael Turbeville of the TBI Crime Laboratory testified as an expert in serology and deoxyribonucleic acid ("DNA") analysis. Agent Turbeville identified the DNA of the defendant, the victim, Mr. Jones, Mr. Nash, Mr. Vinson, and Mr. Quillen to compare with several items of clothing and weapons possibly linked to the murder scene.

Agent Turbeville testified that, upon viewing Mr. Nash's, Mr. Quillen's, and Mr. Vinson's clothing and shoes, the only blood that he found was Mr. Nash's blood on his own shirt and jeans. Agent Turbeville found blood on the sword recovered from Mr. Vinson's home; however, he stated that the DNA profile of the blood did not match any of the DNA profiles he examined. Agent Turbeville only found DNA belonging to the victim on the Bowie knife stuck into the victim's back. He also examined the knives belonging to Mr. Nash. He testified that one of the knives displayed blood but that his examination showed the blood belonged to Mr. Nash.

Agent Turbeville found no blood on the hammers or the tire tool. He explained that, had the small sledgehammer purportedly used to kill the victim been fully engulfed in a fire, the blood and DNA evidence would likely be destroyed by the heat.

Roberta Davis, paralegal in the office of the local attorney who Mr. Jones and the defendant consulted, testified that she recalled on June 18, 2002, two males entered the office stating that one had been involved in a car accident.

The State also introduced several witnesses to show that the defendant intimidated Mr. Jones during his incarceration. Tracie Hyatt Goins testified that she was married to the defendant in 2000. She testified that the two also separated that year but that they were never technically divorced. She testified that she had known the defendant since fifth grade and that he was a talented sketch artist. She also testified that she was familiar with his handwriting. She then looked at one hand-drawn picture and two hand-written letters that were allegedly sent to Mr. Jones by the defendant while incarcerated. She said that all the documents were consistent with what she knew of the defendant's drawing and hand writing.

Charles Noe, who spent time incarcerated with the defendant, testified that the defendant was a talented artist and that he sketched often while in jail. Mr. Noe did not witness the defendant create the drawing received by Mr. Jones, but he said that the defendant was capable of the drawing.

Agent Derek Johnson of the Tennessee Bureau of Investigation ("TBI") testified that both the defendant and Mr. Jones were incarcerated in the same facility after Mr. Jones gave the police information accusing the defendant of the murder of the victim. He recalled an incident where he and Mr. Jones were going onto an elevator with the defendant and that Mr. Jones "bucked" when he saw him. They boarded the elevator and Mr. Jones appeared to be in distress. Agent Johnson then noted that the defendant's lips were moving and that Mr. Jones's eyes "got big and he was visibly shaking." Agent Johnson recalled, "[The defendant] was saying something under his breath to [Mr.] Jones and the

-18-

effect of it was that Jones was afraid." He also saw the defendant "puffing himself up to look bigger."

The State rested, and the defense called Antoinette "Toni" Thomas. Toni testified that she lived at 408 Walnut Road in Bristol, Tennessee, and that she had worked at Wellmont Hospital for 19 years. She stated that Mr. Jones began dating her daughter, Beth, while the two were in high school.

Toni testified that she met the defendant through Mr. Jones and became romantically involved with him. She estimated that after knowing the defendant for two months, she allowed the defendant to stay in her room. She stated that she originally did not intend to have Mr. Jones and the defendant stay at her home and that, originally, she offered food in exchange for the men's helping her with some chores. Toni stated that the defendant worked for her stepfather at Bryant Labels where he sandblasted jeans. She recalled that the defendant planned to learn the business and assume a management role.

Toni acknowledged growing tensions between the defendant and Mr. Jones but could not recall specific instances. She recalled when Mr. Jones was attacked by water balloons and then punched a hole through Beth's door. She explained that the look in Mr. Jones eyes was "just scary." Toni stated that this incident concerned her because she knew Mr. Jones had a gun; however, the defendant later took the gun from him and kept it on the night stand in her bedroom.

Toni also explained that she made Mr. Jones stay outside because he violated her house rule that he could not be in Beth's bedroom past 10:00 p.m. She testified that she felt bad about making him sleep outside but that she "didn't want [Beth] to think that it was okay just to have your boyfriend stay overnight in your room with you, that that just wasn't proper."

Toni also recalled a physical altercation between the defendant and Mr. Jones. She stated that the fight started because the defendant referred to her home as "Fort Goins." She also testified that the defendant never had much money and that he never paid rent to her. She testified that the defendant rarely left the home at night and that he generally spent his evenings with her. Toni stated that she worked until approximately 5:30 p.m. every day and that the defendant was generally home when she returned from work.

Toni testified that she found out that Beth was at the police station at Bristol in the early morning hours of July 31, 2002. She testified that while she tried to remain calm, the defendant seemed very anxious. She said, "[The defendant] was kind of pushing, 'Come on, let's go, let's go find out what's going on.'" She said that the defendant looked by the

night stand for his gun but could not find it. Upon arriving at the police station, several officers approached the defendant and asked if he was Mr. Goins. Upon learning his identity, the officers said they had some questions for him and escorted him to another room.

On cross-examination, Toni testified that the defendant always had sufficient funds to buy cigarettes, but she said that she did not know where he obtained this money because he did not have a job. She also recalled a conversation where she discussed with the defendant that Mr. Jones was afraid of him and that the defendant "kind of grinned." She admitted that she was not home when the defendant and Mr. Jones did projects around the house so she could not know whether Mr. Jones was working his share.

Toni testified that she was no longer in a relationship with the defendant. She stated that when he first went to prison, he would draw pictures for her. One of his drawings to her was admitted into evidence for comparison with the threatening picture given to Mr. Jones.

Jackie Nash testified that he knew of the victim but had no relationship with him. His uncle lived across the street from the victim, and Mr. Nash often saw the victim in his yard. Mr. Nash acknowledged that he gave a statement to the police where he stated that he was in the victim's home on June 18, 2002, and that Mr. Quillen and Mr. Vinson had a "shouting match" with the victim that resulted in violence. He said that this false statement resulted from the detectives' asking him leading questions. He testified that he eventually simply agreed to the law enforcement officers' leading in hopes of being released from the police station. Mr. Nash maintained that he was not with Mr. Quillen or Mr. Vinson on June 18, 2002, and that he had no involvement in the murder of the victim. Mr. Nash admitted telling a woman on the night of the murder that he knew the victim's murderers; however, he maintained that he was drunk and was "pulling one on her."

Larry Quillen testified that his sister, Anita Quillen Holt, killed herself. He said that Ms. Holt lived across the street from the victim. He stated that he did not personally know the victim and that he did not know that he dealt drugs. He stated that the police detained him on June 19, 2002, and that he was intoxicated when they picked him up. He admitted that he fabricated his statement to the police. Mr. Quillen testified that he was at the Haven of Rest Mission on the night of the murder.

Mr. Quillen testified that Ms. Holt and Mr. Vinson disliked the victim but that he did not know why. The two had talked about killing the victim before. Mr. Quillen also testified that Mr. Vinson kept a sword on his wall but that he never saw him carry the sword anywhere.

Based on the evidence as summarized above, the jury convicted the defendant of facilitation of second degree murder and especially aggravated robbery. At the sentencing hearing, the defendant elected to be sentenced under the pre-2005 sentencing laws. The court considered the defendant's criminal history, including federal convictions of bank robbery and carjacking resulting in death along with several less-severe state convictions. The trial court enhanced the defendant's sentence for his Class A felony conviction of especially aggravated robbery to 25 years. The trial court also noted that, by statute, the aggravated robbery sentence had to be served at 100 percent. The court sentenced the defendant to 12 years at 30 percent for his Class B, facilitation of second degree murder conviction.

The trial court found that the defendant had an extensive record of criminal activity and that the defendant was a dangerous offender whose behavior evidenced little or no regard for human life. The trial court ordered the defendant's two convictions be served consecutively and ordered that his state sentences be served consecutively to his federal sentences for unrelated crimes.

## *Issues on Appeal*

The defendant challenges his convictions and his sentences. The defendant claims that the trial court erred by excluding the statements of Anita Holt and testimony of Eric Hilliard and that the trial court's exclusion of this evidence affected his right to present a full defense. The defendant also argues that the trial court erred in denying his motion to sequester the jury. Lastly, the defendant challenges the trial court's ordering that his sentences be served consecutively.

### *I. Ms. Holt's and Mr. Hilliard's Testimony*

The defendant argues that Ms. Holt's statements to the police and Mr. Vinson's statements to his brother as recounted by Mr. Hilliard should have been admitted because "the statements were excluded from the rule against hearsay and were admissible as substantive evidence under Tennessee Rule of Evidence 804(b)(3)." In the alternative, the defendant argues that Ms. Holt's statements were admissible non-hearsay. Lastly, the defendant maintains that admitting these statements was essential to preserving his constitutional right to present a defense.

### *A. Rule of Evidence 804(b)(3)*

The defendant claims that Ms. Holt's statement in which she admits she previously lied to the police was a statement against her interest and therefore admissible. He argues that "Ms. Holt's second statement exposes her to criminal liability for giving a

false report to a law enforcement officer" and that "her admitted exposure to [Mr. Nash, Mr. Vinson, and Mr. Quillen] directly prior to and after the crime could potentially expose her to prosecution for facilitation of murder or even an accessory after the fact." The defendant also maintains that Mr. Vinson's statements overheard by Mr. Hilliard fit within the same hearsay exception.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Rule 804 provides hearsay exceptions when a declarant is unavailable under certain circumstances. Subsection (b)(3) creates a hearsay exception when an unavailable declarant makes a statement against his interest. The rule reads,

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Tenn. R. Evid. 804(b)(4). Our review of a court's admission or exclusion of hearsay is conducted on a de novo basis. *See State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008).

Despite the defendant's claims that Ms. Holt's statements would subject her to criminal liability for facilitation of murder and accessory after the fact, her statements do not support criminal liability for either crime. The statements of Ms. Holt did not indicate that she "knowingly furnishe[d] substantial assistance in commission of the felony," *see* T.C.A. § 39-11-403(a), nor did they show that Ms. Holt intentionally misled the police to help the offenders, *see id.* § 39-11-411. Further, nothing in the evidence suggested that Ms. Holt's statements to the police were under oath. We agree with the trial court that nothing in Ms. Holt's statements amounted to an admission that "so far tended" to subject her to criminal liability. Lastly, even if we did credit the defendant's argument that Ms. Holt's admission of lying to police officers subjected her to possible prosecution, we note that such admission was merely one sentence of a two page statement. Ms. Holt's admission to giving false statements to law enforcement officers is wholly divorced from her recounting the June 18, 2002 murder and would not provide an open door to allow the remainder of the inadmissible hearsay into evidence.

Regarding Mr. Vinson's statements within hearing of Mr. Hilliard, we agree with the trial court that these vague statements did not amount to a statement against penal interest. Mr. Vinson's exclamation that he was glad the victim had died does not intrinsically imply that he murdered the victim. His vague statement about a fight going awry with no reference to when, where, and who the fight involved cannot be viewed as a statement implicating Mr. Vinson in the murder of the victim.

## B. Non-Hearsay

The defendant argues that Ms. Holt's statements were not offered for the truth of the matter asserted and, therefore, were not inadmissible hearsay. *See* Tenn. R. Evid. 801(c). The defendant claims to only want the hearsay statement admitted to show its effect on the listening law enforcement personnel. The trial court held that, under this theory, because the jury was presented with evidence that the Bristol Police Department investigated, arrested, and prosecuted Mr. Quillen, Mr. Vinson, and Mr. Nash for the murder of the victim, Ms. Holt's statements to the police during that investigation were irrelevant and would confuse the issue. *See id.* 402, 403. We agree. The jury was presented with ample evidence of third party guilt even without the use of Ms. Holt's statements. Ms. Holt's statements to police officers effected an investigation into the three men and the fruits of that investigation were presented to the jury without need of that actual statement.

## C. Constitutional Right to Present Defense

Finally, in contradiction of his argument that Ms. Holt's statements were not admitted to prove the truth of the matters asserted therein, the defendant argues that the exclusion of Mr. Holt's statements violates his "right to present a defense which includes the right to present witnesses favorable to the defense." The defendant cites the United States Supreme Court case of *Holmes v. South Carolina*, 547 U.S. 319 (2006). He also argues that the exclusion of Mr. Hilliard's testimony prevented him from presenting a constitutionally valid defense.

We distinguish *Holmes* from the instant case. In *Holmes*, the Supreme Court deemed unconstitutional a state supreme court's ruling that arbitrarily barred the defense's presentation of proof regarding third party guilt when the State produced "strong evidence" and the defense's evidence "d[id] not raise a reasonable inference as to the appellant's own innocence." *Id.* at 324. A total barring of a defense is wholly different from the instant case's exclusion of specific statements based on well-settled evidentiary rules. The Supreme Court has explicitly noted that it has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability -- even if the defendant would prefer to see that evidence admitted."

-23-

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

In light of this analysis, we cannot say that the trial court's use of evidentiary rules to exclude the statements of Ms. Holt and testimony of Mr. Hilliard violated the defendant's right to present a defense. Further, we note that the defendant was able to produce several witnesses and statements inculpating Mr. Nash, Mr. Vinson, and Mr. Quillen. The jury rejected this theory, and it is doubtful that the presentation of the statements at issue would have altered their analysis.

## II. Sequestration of Jury

The defendant further argues that the trial court erred in denying his request that the jury be sequestered. Our criminal code provides that "[i]n all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." T.C.A. § 40-18-116. This court reviews a court's denial of a request for sequestration of the jury on an abuse of discretion basis. *See State v. Larry Walcott*, No. E2004-02705-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Aug. 22, 2005).

Our review of the record shows that the trial court was cognizant of the publicity surrounding the defendant and his various trials. The court conducted individual voir dire to carefully examine whether any jurors with possible knowledge of the defendant from news coverage could remain objective and fair. The court dismissed potential jurors who seemed affected by pretrial publicity. Further, during the trial, the trial court asked the jury whether any members had been exposed to media coverage every morning. On two occasions, jurors admitted to hearing media coverage about the case. In the first instance, a juror stated that the juror heard a radio newscast begin reporting on the trial while in the shower and that the juror "just turned the shower up." The juror maintained, "I just heard the radio announcer that comes on." Although the trial court gave defense counsel an opportunity to question the juror, he declined the opportunity. On the second occasion, a juror reported hearing a report on the trial on the news, but the juror said, "I went and hid in the laundry room." Nothing in the record indicated that either of these incidences contaminated the judgment of these jurors in any regard. In light of the trial court's admonitions to the jury to avoid media coverage of the trial and the jurors' reporting no major violations of the court's instructions, we cannot say the defendant suffered any prejudice as a result of the court's denying his motion to sequester the jury. The trial court did not abuse its discretion in denying the defendant's request that the jury be sequestered, and this court will not grant defendant relief on this ground.

*III. Sentencing*

The defendant lastly contends that the trial court erred in imposing consecutive sentences because such sentencing was "not, as required by law, necessary to protect the public." When considering a challenge to the manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2003). Our case law has long held that the presumption of correctness "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Carter*, 254 S.W.3d at 344; *Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

Code section 40-35-115 provides criteria for which a trial court may impose consecutive sentences on a defendant. The trial court in the instant case found that the defendant had an extensive record of criminal activity, *see* T.C.A. § 40-35-115(b)(2), and that the defendant was a dangerous offender whose behavior indicated little or no regard for human life, *see id.* § 40-35-115(b)(4). The defendant argues that the trial court erred in finding that the defendant was a dangerous offender in light of his serving a life sentence in federal prison. We need not tarry long on his argument, however, because the record amply supports the trial court's finding of the defendant's extensive record of criminal activity. The defendant's brief assumes that the trial court only cited criterion (b)(4) to impose consecutive sentences; however, our review shows that the court also held that (b)(2) justified the consecutive sentencing. The record supports the trial court's use of the defendant's extensive record of criminal activity to order that his sentences be served consecutively, and we find no error in the trial court's sentence.

*Conclusion*

Based on the above-stated reasons, we discern no error in the judgments of the trial court, and accordingly, we affirm its judgments.

_____

JAMES CURWOOD WITT, JR., JUDGE